UNITED STATES, Appellee

v.

Michael C. BEHENNA, First Lieutenant
U.S. Army, Appellant

No. 12-0030

Crim. App. No. 20090234

United States Court of Appeals for the Armed Forces

Argued April 23, 2012

Decided July 5, 2012

STUCKY, J., delivered the opinion of the Court, in which BAKER, C.J., and RYAN, J., joined. EFFRON, S.J., filed a dissenting opinion, in which ERDMANN, J., joined.


<u>Counsel</u>


For Appellant: <u>Jack B. Zimmermann</u>, Esq. (argued); <u>Captain E. Patrick Gilman</u>, <u>Kyle R. Sampson</u>, Esq., <u>Megan E. Smith</u>, Esq., and <u>Terri R. Zimmermann</u>, Esq. (on brief).

For Appellee: <u>Captain Stephen E. Latino</u>, (argued); <u>Major Amber J. Roach</u> (on brief); <u>Major Ellen S. Jennings</u>.

Amicus Curiae for Appellant: <u>Philip D. Cave</u>, Esq. (supervising attorney), <u>Colleen Campbell</u> (law student), <u>Alexandra Stupple</u> (law student), and <u>Ryan Williams</u> (law student) – for National Institute of Military Justice.

Amicus Curiae for Appellant: <u>Donald G. Rehkopf Jr.</u>, Esq. – for National Association of Criminal Defense Lawyers.

Military Judge: Theodore E. Dixon


<u>**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**</u>

Judge STUCKY delivered the opinion of the Court.

We granted review in this case to determine whether the military judge provided complete and accurate self-defense instructions, and whether the Government failed to disclose favorable and material information to Appellant's prejudice. We hold that, although the military judge's instruction on escalation was erroneous, it was harmless beyond a reasonable doubt because escalation was not in issue. Moreover, contrary to Appellant's arguments, withdrawal also was not in issue. We further hold that, even assuming that the information Appellant asserts the Government failed to disclose was favorable, it was immaterial in regard to findings and sentencing because the evidence substantially overlapped with other evidence presented by other defense experts, Appellant was not entitled to an escalation instruction, and the members clearly rejected the Government's theory of premeditated murder. We, therefore, affirm the judgment of the United States Army Court of Criminal Appeals (CCA).

I.

A.

Contrary to Appellant's pleas, a general court-martial with members found Appellant guilty of unpremeditated murder and assault in violation of Articles 118 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 928 (2006).

Appellant was sentenced to a dismissal, twenty-five years of confinement, and forfeiture of all pay and allowances. The convening authority reduced the amount of confinement to twenty years but otherwise approved the sentence as adjudged. The CCA affirmed the findings of guilty and the sentence as approved by the convening authority. United States v. Behenna, 70 M.J. 521, 534 (A. Ct. Crim. App. 2011).

B.

In September 2007, Appellant was assigned to Bayji, Iraq, an area north of Baghdad. His platoon's area of operation was Albu Toma. During his deployment, Appellant learned of information linking Ali Mansur, the deceased in this case, to a group in Albu Toma, who were believed to be responsible for attacks on Coalition Forces. Appellant also learned from human intelligence reports that Mansur would stand on the police station west of Albu Toma overlooking Salaam Village and inform insurgents of Coalition Forces' activities.

Before April 21, 2008, Appellant had given out his cell phone number to locals so that they could contact him with issues. Someone named Ali called Appellant and warned him to avoid Albu Toma or else harm would come to his platoon. Appellant also learned from a source that Mansur had spoken of an improvised explosive device being planted along a roadway used by Appellant's platoon.

On April 21, Appellant's platoon was patrolling Salaam Village and detained two individuals. On the return trip to base, an explosive device was detonated near the vehicles. Appellant saw several individuals in his platoon injured or killed by the blast. A draft intelligence information report issued on April 27 stated that Mansur was likely a member of the group that was operating out of Salaam Village. After the report was issued, Mansur was apprehended for interrogation, but shortly after questioning was finished, Mansur was to be returned to Albu Toma.

Appellant read the report of Mansur's interrogation and only found information regarding Mansur's job and background and his relation to an RPK.[1] Appellant asked that Mansur be reinterrogated based on his belief that Mansur had information on insurgents operating out of Salaam Village, who Appellant believed were responsible for the April 21 attack. Appellant did not participate in the second interrogation, and although Mansur provided information willingly, the interrogator told Appellant that Mansur was being deceptive.

---

[1] This acronym was not defined in the record, but it likely refers to a Russian light machine gun, Ruchnoy (also spelled "Ruchnoi") Pulemyot Kalashnikova. See J. R. Potts, RPK (Ruchnoi Pulemyot Kalashnikova) Light Machine Gun, Military Factory (Feb. 16, 2012), http://www.militaryfactory.com/smallarms/detail.asp?smallarms_id=144.

After the second interrogation, Appellant was ordered to return Mansur to Albu Toma. Appellant continued to believe that Mansur had information regarding the April 21 attack and the group operating out of Salaam Village; he further believed those questions had not been asked and answered. On the day that Mansur was to be released, Appellant went with an interpreter, Mr. Tarik Abdallah Silah (referred to by the parties as Harry), to retrieve Mansur from his cell. Appellant told Mansur, "I'm going to talk to you later on today. There is [sic] three pieces of information that I want from you . . . . If I don't get that information today, you will die today." Appellant admitted the scare tactic was unauthorized but claimed his intent was only to frighten Mansur into providing information.

Appellant's platoon returned a different detainee before passing through Albu Toma without releasing Mansur. Appellant ordered his platoon to take the desert route back to base, because he wanted "to talk to Ali in a remote, secure location." On the desert route, Appellant saw a culvert; he ordered the platoon to stop, because he believed this was an appropriate location to speak with Mansur. Appellant told Harry to follow him as Appellant retrieved Mansur from Sergeant Warner's truck. Appellant asked Warner if he had a thermite grenade. Warner did not at that time, and Appellant did not order him to find one.

Appellant, Harry, and Mansur immediately started walking towards the culvert. In the meantime, Warner found a thermite grenade and caught up with the group at the culvert. Upon reaching the culvert, Appellant saw there was a second culvert and led the group there. Outside the second culvert, Appellant told Mansur he wanted the information he had asked about earlier that day. Mansur responded that he did not know anything.

Appellant then moved Mansur into the culvert and cut off his shirt and told Warner to cut off his pants and underwear. Appellant then attempted to remove the zip ties that bound Mansur's hands, but Harry eventually had to remove them for Appellant. Appellant ordered Mansur, who was then naked and unbound, to sit on a rock or piece of concrete inside the culvert. Mansur continued to claim ignorance, so Appellant pointed a loaded pistol at him to frighten him into providing the information.

### C.

By this time, it was dark and dusty outside, visibility was low, and Warner was using night vision goggles. As soon as Appellant pulled out his pistol, Harry stepped outside the culvert because he was afraid of the ricochet. Harry testified that from his vantage point he could make out the figure of a person but could not distinguish Mansur's arms and hands. Once Harry was outside the culvert, Appellant again asked for the

6

information and stated that if Mansur did not tell him what he wanted to hear that he would die.  Mansur said something, and Harry looked at Appellant to translate, and then two shots were fired.  Harry testified that everything happened quickly, that he was surprised by the gunshots, and that he did not see exactly what happened before the shots were fired.  He did not know what happened to cause Appellant to shoot Mansur.

Warner was approximately thirty-five to fifty meters away when he heard the first pistol shot.  From his original angle, Warner could not see inside the culvert; so, he moved to a better position.  He saw the muzzle flash from the second shot.  Warner ultimately identified Appellant as the individual who fired the pistol shots that killed Mansur.  When Warner reached the culvert, Appellant told him to "[t]hrow it."  Warner asked, "[t]hrow what" and Appellant said "[d]on't be stupid."  Warner tossed the thermite grenade in the direction of Mr. Mansur's body.  Appellant then told Warner to take care of the clothes.[2]

Appellant's testimony was mostly consistent with that of the other witnesses, although he did elaborate on what occurred before he fired his pistol.  He testified that he pointed his pistol at Mr. Mansur and told him that "[t]his [was his] last

---

[2] Appellant testified later in the trial that immediately after firing the shots he did not say anything.  It is unclear from the context of the question and answer if Appellant was refuting

chance to tell the information or [he would] die." Appellant testified he heard Mr. Mansur say something in Arabic that was different than his previous responses, so he looked over to Harry for interpretation.

While looking at Harry, Appellant testified that he heard a piece of concrete hit over his left shoulder. He turned towards Mansur and saw him reaching for the pistol; the distance between them was only two or three feet. He took a step or two to his left, towards the entrance of the culvert, to create distance between him and Mansur, and then fired two shots into Mansur. Mansur was shot once in the head and once in the chest; the order of the shots was a contested issue. Behenna, 70 M.J. at 524. Appellant stated that everything happened fast and that he fired the shots because he "was scared [Mansur] was going to take [his] weapon." Appellant insisted throughout his testimony that he never intended to kill Mansur; he just wanted to scare him for information.

Upon returning to base, Appellant took Warner on a walk and asked him if he was "cool." Warner indicated he was. Harry later asked Appellant why he had shot Mansur, and Harry testified that Appellant said "'Ali Mansur planted explosives twice on a specific road and the explosive that went off in the

---

Warner's claim. It is clear, however, that an incendiary grenade was set off near Mansur's body.

Salaam Village, he had a hand into this too.  He was part of this operation.'"

### D.

During trial, the defense provided unrebutted testimony from two experts in the field of forensics.  Dr. Radelat, a medical doctor, testified that in his expert opinion that Mansur was standing when he was shot.  He testified that Mansur's chest wound had entered under his right arm between the fourth and fifth rib in a horizontal path indicating that the pistol was level with Mansur's wound and that Mansur's right arm was not in the flight path of the bullet.

Dr. Radelat theorized that the chest wound was inflicted first, because the photographs appeared to show Mansur clutching a chest wound with blood running over his hand.  He bolstered this analysis by noting that the head wound would have been so devastating that, had it been inflicted first, Mansur would not have been capable of reacting to the chest wound.  Dr. Radelat admitted that the horizontal wound could have been caused if Mansur had been falling at the same angle the gun was pointed, although he suggested this scenario defied reason.

The defense also called Mr. Bevel, an expert in scene reconstruction.  Mr. Bevel theorized that the chest wound was inflicted first and that Mansur was standing when shot.  He concluded that Mansur was standing when shot because of the

level trajectory of the wound.  He also bolstered that opinion based on the fact that it appeared Mansur had clutched the chest wound and the manner in which the blood ran over Mansur's hand. He acknowledged that given the wound's location on Mansur's chest that his right arm had to be out of the flight path of the bullet, which, at the very least, meant his arm was not hanging straight down.

He noted that the head wound also had a horizontal trajectory, which could be consistent with Mansur standing, so long as the second shot was fired as Mansur slumped towards the ground.  Mr. Bevel also testified that the nature of the blood trail indicated that Mansur likely was not falling backwards. Under Government cross-examination, Mr. Bevel admitted that other scenarios could reasonably explain the horizontal wound trajectories to the chest and head and how Mansur's right arm avoided the flight pattern of the bullet.  Facts necessary to resolve the alleged violation under Brady v. Maryland, 373 U.S. 83 (1963), are included below.

## II.

The first issue is whether the members were improperly instructed about how Appellant could lose and regain the right to act in self-defense.  Although we find the instruction on escalation was erroneous, the error was harmless beyond a reasonable doubt.  Appellant was not entitled to such an

instruction at all, as there was no evidence raising the issue

of escalation. Moreover, contrary to Appellant's arguments,

withdrawal was not in issue either, for the same reason.

A.

An allegation that the members were improperly instructed

is an issue we review de novo. United States v. Ober, 66 M.J.

393, 405 (C.A.A.F. 2008). In regard to form, a military judge

has wide discretion in choosing the instructions to give but has

a duty to provide an accurate, complete, and intelligible

statement of the law. See United States v. Wolford, 62 M.J.

418, 419 (C.A.A.F. 2006) (recognizing that instructions must be

correct and complete); see also United States v. Medina, 69 M.J.

462, 465 (C.A.A.F. 2011) (noting that an instruction must be

clear and correct). In reviewing the propriety of an

instruction, appellate courts must read each instruction in the

context of the entire charge and determine whether the

instruction completed its purpose. See Jones v. United States,

527 U.S. 373, 391 (1999).

In regard to substance, the instructional issues in this

case involve self-defense. The standard for self-defense is set

out in Rule for Court-Martial (R.C.M.) 916(e)(1), which provides

that if an individual apprehends on reasonable grounds that

grievous bodily harm or death is about to be wrongfully

inflicted to his or her person, then the individual may use such

11

force as is appropriate for the circumstances, including deadly force.  See United States v. Lewis, 65 M.J. 85, 88 (C.A.A.F. 2007) (recognizing that R.C.M. 916 generally restates the well-settled law of self-defense).

The right to act in self-defense, however, is not absolute. Initial aggressors and those involved in mutual combat lose the right to act in self-defense.  See R.C.M. 916(e)(4).  However, an initial aggressor or a mutual combatant regains the right to act in self-defense if the other party escalates the degree of force, or if the initial aggressor or the mutual combatant withdraws in good faith and communicates that intent to withdraw.  See Lewis, 65 M.J. at 88; R.C.M. 916(e)(4).  With these principles in mind, we turn our attention to the instructions in this case.

B.

The military judge provided a facially correct instruction on self-defense.[3]  Appellant's claim of error is in regard to the

---

[3] The propriety of giving the initial self-defense instruction has not been challenged; it is provided here for context.

> For self-defense to exist the accused must have
> had a reasonable apprehension that death or grievous
> bodily harm was about to be inflicted on himself and
> he must have actually believed that the force he used
> was necessary to prevent death or grievous bodily
> harm. In other words, self-defense has two parts:
> first the accused must have had a reasonable belief
> that death or grievous bodily harm was about to be
> inflicted upon himself.  The test here is whether

following instruction on losing and regaining the right to act

in self-defense:

> Now there exists evidence in this case that the
> accused <u>may have been assaulting</u> Ali Mansur
> immediately prior to the shooting by pointing a loaded
> weapon at him.  A person who without provocation or
> other legal justification or excuse assaults another
> person is not entitled to self-defense unless the
> person being assaulted escalates the level of force
> beyond that which was originally used.  The burden of
> proof on this issue is on the prosecution.  If you are
> convinced beyond a reasonable doubt that the accused,
> without provocation or other legal justification or
> excuse, assaulted Ali Mansur then you have found that
> the accused gave up the right to self-defense.
> <u>However, if you have a reasonable doubt that the
> accused assaulted Ali Mansur, was provoked by Ali
> Mansur, or had some other legal justification or
> excuse, and you are not convinced beyond a reasonable
> doubt that Ali Mansur did not escalate the level of
> force</u>, then you must conclude that the accused had the

---

> under the same facts and circumstances present in this
> case, an ordinary, prudent adult person, faced with
> the same situation would have believed that there were
> grounds to fear immediate death or serious bodily
> harm; second, the accused must have actually believed
> that the amount of force he used was required to
> protect against death or serious bodily harm.
>
> To determine the accused's actual belief as to
> the amount of force which was necessary you must look
> at it -- you must look at the situation through the
> eyes of the accused. In addition to the circumstances
> known to the accused at the time, the accused age,
> intelligence, and mental condition are all important
> factors to consider in determining the accused's
> actual belief about the amount of force required to
> protect himself.  As long as the accused actually
> believed that the amount of force he used was
> necessary to protect himself against death or grievous
> bodily harm, the fact that the accused may have used
> excessive force does not matter.

13

> right to self-defense, and then you must determine if
> the accused actually did act in self-defense.

Emphasis added.

This instruction is erroneous for two reasons. First, the military judge provided no guidance on how to evaluate an offer-type assault, which occurs, for instance, when an individual points a loaded pistol at another person without lawful justification or authorization. We recognize that the military judge had previously instructed the members on an assault consummated by a battery, but those instructions did not include guidance on how to evaluate the offer-type assault that preceded the killing of Mansur. See Manual for Courts-Martial, United States (MCM) pt. IV, ¶ 54.c.(1)(b) (2012 ed.). Thus, the members were never instructed that for Appellant to have assaulted Mansur by pointing the pistol at him, Mansur had to reasonably apprehend immediate bodily harm. See MCM pt. IV, ¶ 54.c.(1)(b)(ii). The two varieties of assault are sufficiently different that, even when the instructions are viewed holistically, the first portion of the instruction was incomplete. See United States v. Marbury, 56 M.J. 12, 17 (C.A.A.F. 2001) (holding the critical issue in offer-type assaults is whether the victim reasonably apprehended imminent bodily harm as compared to assaults consummated by a battery in which the critical issue is actual bodily harm).

14

More importantly, the second emphasized portion of the instruction is an erroneous statement of law. Specifically, the military judge linked the lawful use of force with the issue of escalation with the conjunction "and." ("However, if you have a reasonable doubt that the accused assaulted Ali Mansur, was provoked by Ali Mansur, or had some other legal justification or excuse, and you are not convinced beyond a reasonable doubt that Ali Mansur did not escalate the level of force, then you must conclude that the accused had the right to self-defense . . . ." (emphasis added)). This is an inaccurate statement of law because Appellant would have had the right to self-defense if his original use of force had been lawful -- it was provoked, justified, or otherwise excusable (i.e., Appellant was not an initial aggressor) -- or if Mr. Mansur had escalated the level of force. See Lewis, 65 M.J. at 88-89; R.C.M. 916(e)(1),(4). Having found that the instruction was erroneous, we must test for prejudice.

## C.

When instructional errors have constitutional implications, as instructions involving self-defense do, then the error is tested for prejudice under a "harmless beyond a reasonable doubt" standard. Lewis, 65 M.J. at 87 (citation and quotation marks omitted). Only when the reviewing authority is convinced beyond a reasonable doubt that the error did not contribute to

15

the defendant's conviction or sentence is a constitutional error harmless. Id. (citations omitted).

Generally, a superfluous, exculpatory instruction that does not shift the burden of proof is harmless, even if the instruction is otherwise erroneous. See United States v. Thomas, 34 F.3d 44, 48 (2d Cir. 1994) (providing a potentially erroneous self-defense instruction could not have been prejudicial to the defendants because "their need to defend themselves arose out of their own armed aggression"); Melchior v. Jago, 723 F.2d 486, 493 (6th Cir. 1983) (even if instruction was erroneous it was harmless beyond a reasonable doubt where "there was insufficient evidence to submit the issue of self-defense to the jury in the first instance").

As discussed further below, Appellant lost the right to act in self-defense as a matter of law; therefore, any instruction on losing and regaining the right to self-defense was superfluous. Our case law makes clear that a military judge is only required to instruct when there is some evidence in the record, without regard to credibility, that the members could rely upon if they choose. United States v. Schumacher, 70 M.J. 387, 389 (C.A.A.F. 2011) (citing Lewis, 65 M.J. at 87). In other words, a military judge must instruct on a defense when, viewing the evidence in the light most favorable to the defense, a rational member could have found in the favor of the accused

in regard to that defense.  See id. (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)).  This is a legal question that is reviewed de novo.  See id. at 389-990.

D.

We begin by noting that Appellant was not in an active battlefield situation, that Mansur was not then actively engaged in hostile action against the United States or its allies, and that there were no other military exigencies in play.  Appellant's counsel at oral argument conceded that Appellant was not seeking a special privilege based on Appellant's status as a soldier or presence on the battlefield.  After careful consideration, we agree that the events that transpired in the culvert do not implicate the unique aspects of military service in a manner that requires us to apply other than basic criminal law concepts.  Thus, we evaluate this situation by applying the fundamental concepts of self-defense as imbedded in this Court's case law and the MCM.

As discussed earlier, if Appellant was the initial aggressor -- i.e., the one that provoked or brought about the situation that resulted in the necessity to kill another[4] -- then

---

[4] See United States v. Cardwell, 15 M.J. 124, 126 (C.M.A. 1983) (discussing an initial aggressor as one who starts an affray); see also United States v. Branch, 91 F.3d 699, 717 (5th Cir. 1996) (citing several cases for the same proposition), rev'd on other grounds and remanded, Castillo v. United States, 530 U.S. 120 (2000).

17

he lost his right to self-defense, unless the deceased, Mansur, either escalated the level of force or Appellant withdrew and communicated that withdrawal in good faith. See Lewis, 65 M.J. at 88-89; R.C.M. 916(e)(1),(4).

Even when viewed in the most favorable light, Appellant's own testimony about the events that transpired in the culvert demonstrate that he was the initial aggressor because he brought about the situation that resulted in his killing of Mansur. Appellant deviated from his assigned duty to return Mansur to his home, without authority, to take him to a remote culvert in the desert, far from any active hostilities for further unauthorized interrogation.

More importantly, Appellant then stripped the detainee naked and forced him to sit on a rock while Appellant, in full combat attire with a loaded pistol, interrogated him. Appellant also told Mansur, as he had on other occasions that day, that he was going to die unless he provided specific information. Cf. MCM pt. IV, ¶ 54.c.(1)(c)(iii) ("Thus, if Doe points a pistol at Roe and says, 'If you don't hand over your watch, I will shoot you.' Doe has committed an assault upon Roe.").

Although we are mindful that Mansur was a detainee, it is evident that Appellant's use of force in the culvert before the shooting -- the critical moment in reviewing this issue -- was

unauthorized and excessive.[5]  Cf. United States v. Archer, 486 F.2d 670, 676-77 (2d Cir. 1973) ("It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums.").  Even accepting the facts as Appellant described them on direct examination, there is no evidence on which a rational member could rely to conclude that Appellant was not the initial aggressor.  The next question is whether a rational member could have found that Appellant regained the right to act in self-defense as a result of either Mansur's escalating the conflict or Appellant's withdrawing in good faith.

Under our case law, Mansur could not have escalated the level of force in this situation,[6] as Appellant had already

---

[5] Appellant relied on a number of 42 U.S.C. § 1983 civil rights cases in his brief.  These cases are generally inapplicable to the issue before us, because the protection of civil liberties of American citizens, which Mansur was not, varies greatly from the principles underlying criminal law and the justification for using deadly force.  However, we note that even § 1983 cases recognize that if an officer points a weapon at an individual who poses no threat, then it is so clearly an excessive use of force that the officer is not entitled to qualified immunity.  Cf. Baird v. Renbarger, 576 F.3d 340, 346-47 (7th Cir. 2009) (holding an officer was not entitled to qualified immunity when he pointed his gun at individuals because the people targeted and the crime investigated did not suggest even a hint of danger).

[6] We are not deciding what, if any, right Mansur, a detainee of the United States Armed Forces, had to defend himself.  We are determining Appellant's right to act in self-defense under well-settled criminal law concepts and in light of his actions.

introduced deadly force.  See United States v. Stanley, 71 M.J. 60, 63 (C.A.A.F. 2012); see also Armstrong v. Bertrand, 336 F.3d 620, 623, 625-26 (7th Cir. 2003) (holding that an armed gunman did not regain the right to self-defense even though the victim threatened to kill the gunman and lunged for his gun); Wayne R. LaFave, Substantive Criminal Law §10.4(e) (2d ed. 2003) (noting that a nondeadly aggressor is one who uses "only his fists or some nondeadly weapon").  Even assuming for a moment that Mansur could have escalated the level of force, we conclude that a naked and unarmed individual in the desert does not escalate the level of force when he throws a piece of concrete at an initial aggressor in full battle attire, armed with a loaded pistol, and lunges for the pistol.  See Armstrong, 336 F.3d at 623, 625-26. This is especially so when the initial aggressor "had every opportunity to withdraw from the confrontation and there was no evidence he either attempted or was unable to do so."  See Behenna, 70 M.J. at 532-33; see also R.C.M. 916(e)(4) Discussion ("Failure to retreat . . . does not deprive the accused of the right to self-defense[, but] [t]he availability of avenues of retreat is one factor which may be considered in addressing . . . that the force used was necessary for self-protection).

Furthermore, nothing in Appellant's testimony indicated that he clearly manifested an intent to withdraw or that Mr. Mansur prevented Appellant from withdrawing.  See United States

v. O'Neal, 16 C.M.A. 33, 37, 36 C.M.R. 189, 193 (1966) ("His testimony contains no suggestion of a word or act that could reasonably be interpreted by the others as indicating he wanted to end the fight."). As the CCA found, there was no evidence that Mansur made contact with Appellant's weapon, that Appellant indicated a desire to withdraw, or that Appellant made a good-faith effort to withdraw. Behenna, 70 M.J. at 532-33. Rather, Appellant took one or two steps towards the entrance of the culvert where the vast desert, Warner, and the rest of his platoon were waiting, before he shot Mansur twice. See id. at 523. Even accepting the facts as Appellant described them on direct examination, no rational member could have found either that Mansur escalated the situation or that Appellant withdrew in good faith.

Contrary to the dissent's suggestion, we have not decided any factual matters that should have been before the members. There is no factual issue for the members to resolve until "there is some evidence upon which members could reasonably rely [upon] to find that each element of the defense has been established." Schumacher, 70 M.J. at 389-90. Importantly, the issue in this case is not whether there was some evidence of self-defense. Rather, our holding is that any evidence of self-defense was overcome by other events, namely the unrebutted evidence that Appellant was an initial aggressor and the dearth

of evidence of escalation by Mansur or good faith withdrawal by Appellant -- matters thoroughly discussed above.[7]

Ultimately, even if we assume that Mansur lunged for Appellant's pistol and Appellant feared that Mansur would use the pistol if he was able to seize it, because Appellant was the initial aggressor, and because there was no evidence to support a finding of escalation or withdrawal, a rational member could have come to no other conclusion than that Appellant lost the right to act in self-defense and did not regain it.[8] See Branch, 91 F.3d at 712 ("The district court is not required to put the case to the jury on a basis that essentially indulges and even encourages speculations." (quotation marks and citation omitted)). As such, withdrawal was not in issue and the erroneous instruction on escalation was superfluous. As we noted earlier, superfluous, exculpatory instructions that do not impermissibly shift burdens are generally harmless beyond a

---

[7] The record is devoid of any evidence that Mansur used or had access to any means or force that could have caused Appellant's death or grievous bodily harm. Indeed, the evidence suggests just the opposite. See Behenna, 70 M.J. at 532 (noting that there is no evidence that Mansur, who was naked and unarmed, made contact with Appellant's pistol).

[8] Despite giving the instruction, the military judge ultimately reached a similar conclusion in resolving the alleged Brady violation. ("In applying the law to the facts of this case, the members could come to no reasonable conclusion other than 1LT Behenna did not have the right to self-defense. Accordingly . . . any evidence as to self-defense did not have, nor would any additional evidence as to self-defense have, made a difference in the Court's determinations.").

reasonable doubt, even if the instructions are otherwise erroneous.  Nothing in these facts suggests that we should deviate from that conclusion.  For this reason, Appellant is not entitled to relief.

III.

The second issue is whether the Government failed to disclose favorable information to Appellant's detriment in violation of Brady.  Even if we assume error in this regard, the error was harmless beyond a reasonable doubt both in regard to findings and sentence.

A.

The Government received a discovery request from defense counsel on August 28, 2008, requesting that the Government provide defense counsel with all exculpatory evidence.  The Government gave notice that it had retained Dr. Herbert MacDonell as an expert consultant, whose opinion up to trial was favorable for the Government.  The Government ultimately rested its case without calling Dr. MacDonell.  On Wednesday, February 25, 2009, defense put on the testimony of Dr. Radelat and Mr. Bevel.  During cross-examination by trial counsel, both defense experts admitted that alternative explanations existed for the forensic evidence.

Dr. MacDonell, with the consent of the parties, sat in the gallery while the other experts testified.  On Wednesday night,

after court was recessed and after the defense experts had testified, Dr. MacDonell, in the presence of all three Government trial counsel, demonstrated a scenario:

> I asked if he [the aid to the demonstration] could stand in front of me and I put a finger in his ribs and said "Bang, now drop." And he went down to his knees and as he went by the finger I said, "Bang." I said, "Now that seems to me to be the only logical thing." I admit it is extremely unlikely, but sometimes things that happen that are statistically improbable do happen [sic].

Dr. MacDonell also testified that he ended his discussions with trial counsel by stating that "anything is possible," because "[y]ou can't be certain of a theory like that. A scenario can be presented, but if it is consistent with the facts it can be believed, but it may not be the only explanation."

On Thursday, Dr. MacDonell heard Appellant's testimony, which was consistent with the theory he presented Wednesday. This caused Dr. MacDonell to believe that Appellant was telling the truth. During the post-trial Article 39(a), Brady hearing, Dr. MacDonell testified that after hearing Appellant's testimony he only spoke with another Government witness about how Appellant's description of events was exactly how he had theorized it might have occurred. In an affidavit submitted after the Article 39(a) session, however, Dr. MacDonell averred that he also told the prosecutors on Thursday that "although the scenario I had presented to them the day before [Wednesday] was

24

unlikely, it still was the only theory I could develop that was consistent with the physical evidence. It was also exactly the way Lt. Behenna had described the events."

Regardless of the discrepancy, as Dr. MacDonell left for his return flight on Thursday, he told defense counsel he would have been a great witness for them. When asked to elaborate, Dr. MacDonell said he thought it would have been inappropriate to explain further given his relation to the Government in this case. In light of Dr. MacDonell's odd statement on Thursday, defense counsel asked the prosecutors before trial began on Friday morning if it was in possession of any exculpatory information. The prosecutors stated that they were unaware of any exculpatory information. Later that day, the members returned a finding of guilty to assault and unpremeditated murder.

At approximately 4 p.m. on Friday, Dr. MacDonell sent an e-mail to the prosecutors, in which he stated that "I feel that [my opinion] is quite important as possible exculpatory evidence so I hope that, in the interest of justice, you informed [defense counsel] of my findings. It certainly appears like Brady material to me." One of the prosecutors discovered the e-mail late Friday night and forwarded the e-mail to defense counsel with a note that stated "I am not sure that I believe that Mr. MacDonell's new opinion is exculpatory, but I wanted to

send it to you in an abundance of caution." Defense counsel moved for a mistrial on the basis of a Brady violation.

B.

Pursuant to Brady, the Government violates an accused's "right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." Smith v. Cain, 132 S. Ct. 627, 630 (2012). Evidence is favorable if it is exculpatory, substantive evidence or evidence capable of impeaching the government's case. United States v. Orena, 145 F.3d 551, 557 (2d Cir. 1998) (citing United States v. Bagley, 473 U.S. 667, 676 (1985)). Evidence is material when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Smith, 132 S. Ct. at 630. To be material, the evidence must have made the "likelihood of a different result . . . great enough to 'undermine[] confidence in the outcome of the trial.'" Id. (alteration in original) (citation omitted). Once a Brady violation is established, courts need not test for harmlessness. Kyles v. Whitley, 514 U.S. 419, 435-36 (1995).[9]

---

[9] The Fifth Circuit, in Kyles v. Whitley, noted that Brady claims are subject to harmless error review. See 5 F.3d 806, 818 (5th Cir. 1993). The Supreme Court, in reviewing that assertion, stated that "contrary to the assumption made by the Court of Appeals, 5 F.3d at 818, once a reviewing court applying Bagley [materiality] has found constitutional error there is no need for further harmless-error review." Kyles, 514 U.S. at 435. This makes sense; if there is a reasonable probability that the

26

C.

We do not need to determine who learned of what information when. Even if we assume the evidence was favorable and not properly disclosed, the evidence was ultimately immaterial both as substantive and impeachment evidence. Dr. MacDonell's testimony, at most, would have made Appellant's version of events more likely, that is, that Appellant shot Mansur as he stood and reached for Appellant's pistol. In turn, whether Mansur remained seated or stood when he was shot was only relevant to two issues: premeditation and self-defense.

The result in this case -- Appellant was convicted of unpremeditated murder -- negates any argument that this evidence could have affected the outcome on the issue of premeditation, as the members clearly rejected the Government's theory of the case -- a premeditated, execution-style killing -- when they returned a verdict that Appellant was guilty of unpremeditated murder. In regard to self-defense, Dr. MacDonell's testimony could not have independently established the factual predicate for a self-defense theory; rather, it would have only bolstered Appellant's version of events. Assuming the truth of

_____

evidence would have changed the result at trial, then, by definition, the failure to disclose cannot be harmless. There is no need to conduct a redundant test. See United States v. Meek, 44 M.J. 1, 5 n.2 (C.A.A.F. 1996) (noting that to the extent that the harmless error test is incorporated into another

27

Appellant's version of what transpired in the culvert, he had lost the right to act in self-defense as a matter of law.  See supra Part II.D.

Moreover, Dr. MacDonell's testimony did not differ greatly from either of the defense experts' testimony.  The two defense experts essentially testified that the most logical theory was that Mansur stood as he was shot, with his right arm out of the way, as if he were reaching for something, but they agreed this was not the only theory that could explain the forensic evidence.  Dr. MacDonell would have agreed that the defense theory was the most, maybe only, logical outcome, but that one "can't be a certain of a theory like that," because "anything is possible,"  The difference between Dr. MacDonell's opinion and the other experts' opinions was negligible.  See United States v. Gonzalez, 62 M.J. 303, 307 (C.A.A.F. 2006) (noting that the overlapping nature of the evidence undercuts an argument that the failure to disclose pursuant to Brady was prejudicial); see also United States v. Agurs, 427 U.S. 97, 114 (1976) (noting that the alleged Brady material did not contradict any evidence already admitted and was similar to other evidence in the record in holding that there was no Brady violation).

---

element of the test, then the harmless error test may be unnecessary).

28

Although there may be value in a Government expert's testimony that the defense theory is more convincing than the Government's theory of the case, it is significantly less so when, as in this case, the Government expert did not testify on behalf of the Government or recant testimony previously provided.  See United States v. Cooper, 654 F.3d 1104, 1120 (10th Cir. 2011) (recognizing that the value of Brady evidence must be evaluated in light of the other evidence admitted at trial).  Dr. MacDonell's testimony ultimately would not have added much to Appellant's case, other than the novelty that it came from a nontestifying expert witness associated with the Government's case.  Candidly, that novelty had little evidentiary value here in light of the similarity of Dr. MacDonell's opinion with the other defense experts and the ease with which Dr. MacDonell's opinion could have been impeached by his failure to provide a reasonably certain or consistent opinion.  For these reasons, our confidence in the results of trial -- both for findings and sentencing[10] -- is not undermined

---

[10] Appellant, despite knowing of Dr. MacDonell's opinion prior to sentencing, did not ask for a continuance or take any steps to produce Dr. MacDonell on sentencing or otherwise make his testimony available at sentencing.  This failure belongs to Appellant, not the Government.  Appellant knew of the information with sufficient time to use the information on sentencing; thus, the evidence was timely disclosed in regard to sentencing.  See DiSimone v. Phillips, 461 F.3d 181, 196-97 (2d Cir. 2006) (recognizing that there is no bright-line rule for when a disclosure is timely; rather, the question is whether the

by the Government's failure to disclose Dr. MacDonell's

testimony.

IV.

The judgment of the United States Army Court of Criminal

Appeals is affirmed.

---

evidence was disclosed in sufficient time for an accused to take
advantage of the information, a determination necessarily
dependent on the totality of the circumstances).

EFFRON, Senior Judge, with whom ERDMANN, Judge, joins (dissenting):

Appellant served as a platoon leader in Iraq in 2008 in an area north of Baghdad and Tikrit. The mission of Appellant's unit included counterinsurgency operations and activities in the Albu Toma area in conjunction with Iraqi forces. On April 21, 2008, a hostile attack featuring an improvised explosive device (IED) killed two members of his platoon. Based upon intelligence information, Appellant interrogated Ali Mansur, a person suspected of involvement in terrorist activities, on May 5, 2008, and on May 16, 2008, in an effort to pinpoint responsibility for the terrorist attack. Two different narratives emerged at trial concerning the May 16 interrogation. The prosecution, based upon witness testimony and forensic evidence, contended that Appellant murdered Ali Mansur, who was unarmed, unclothed, and defenseless. The defense, based primarily on Appellant's testimony, contended that Ali Mansur suddenly reached for Appellant's weapon during the interrogation, and Appellant shot Ali Mansur in self-defense.

At trial, the prosecution and the defense each brought to the members' attention evidence in the record supporting their respective views. The responsibility for determining what actually happened -- the crime of murder or justifiable self-defense -- rested with the members of the court-martial panel.

The responsibility for ensuring that the members made this decision in accordance with the proper legal standards rested with the military judge.

Following the close of the evidence, the military judge offered a variety of instructions regarding the matters at issue, including an instruction on self-defense. The defense objected to the content of the self-defense instruction. The military judge rejected the defense objection, and the members returned a verdict of guilty on the murder charge now under review.

Before our Court, Appellant challenges the content of the instruction, and raises a related issue concerning the failure of the prosecution to provide timely disclosure of evidence favorable to the defense. The majority rejects these challenges based upon the majority's conclusion that any instructional error was harmless. __ M.J. __ (22-23) (C.A.A.F. 2012). For the reasons set forth below, I respectfully dissent.

## I.   SELF-DEFENSE

### A. THE DECISIONAL PROCESS IN COURTS-MARTIAL

1.   The separate responsibilities of the military judge and the court-martial panel

In trials by court-martial, Congress has vested the responsibility for entering findings -- the decision as to whether a servicemember is guilty -- in the court-martial panel, which performs the function of a jury.  See Articles 25, 51, 52, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 825, 851, 852 (2006).  To ensure that the panel reaches this determination in accordance with the law, and not on the basis of extraneous or other improper influences, the military judge instructs the panel on the applicable legal standards for reaching the decision on findings.  See Article 51(c), UCMJ, 10 U.S.C. § 851(c) (2006); Rule for Courts-Martial (R.C.M.) 920.

2.   The requirement to instruct when self-defense is in issue

Among the required instructions, the military judge must instruct the panel on any special defense "in issue," including self-defense.  R.C.M. 920(e)(3); R.C.M. 916(e); United States v. Stanley, 71 M.J. 60, 62 (C.A.A.F. 2012) (citing United States v. McDonald, 57 M.J. 18, 20 (C.A.A.F. 2002)).  The military judge must treat self-defense as in issue when "'some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose.'"  Stanley, 71 M.J.

3

at 63 (quoting <u>United States v. Lewis</u>, 65 M.J. 85, 87 (C.A.A.F.

2007)); <u>see</u> Dep't of the Army, Pam. 27-9, Legal Services,

Military Judges' Benchbook para. 5-1.<u>a</u>. (Jan. 10, 2010)

[hereinafter Military Judges' Benchbook] ("The credibility of

witnesses, including the accused, whose testimony raises a

possible affirmative defense, is not a factor in determining

whether an instruction is necessary.").

3.    <u>Raising the issue of self-defense</u>

R.C.M. 916(e) sets forth the rules governing self-defense.

Under R.C.M. 916(e)(1):

> It is a defense to a homicide . . . that the accused:
>
> (A) Apprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on the accused; and
>
> (B) Believed that the force the accused used was necessary for protection against death or grievous bodily harm.

If the record contains "some evidence" raising the issue of

self-defense, the military judge must instruct the members of

their responsibility to make the following determinations.

First, the court-martial panel must decide whether the accused

"had a reasonable belief that death or grievous bodily harm was

about to be inflicted on (himself) . . . ."  Military Judges'

Benchbook para. 5-2-1.  The Benchbook further states: "The test

here is whether, under the same facts and circumstances

4

presented in this case, an ordinary, prudent adult person faced with the same situation would have believed that there were grounds to fear immediate death or serious bodily harm." Id. Second, the court-martial panel must decide whether the accused "actually believed that the amount of force (he)(she) used was required to protect against death or serious bodily harm." Id. In making that decision, the court-martial panel "must look at the situation through the eyes of the accused." Id. "In addition to the circumstances known to the accused at the time," the court-martial panel must consider other factors pertinent to the case as identified by the military judge. Id.

4. The degree of force

The military judge also must instruct the members on how to address the degree of force used by the accused:

> As long as the accused actually believed
> that the amount of force (he)(she) used was
> necessary to protect against death or
> grievous bodily harm, the fact that the
> accused may have used excessive force (or a
> different type of force than that used by
> the attacker) does not matter.

Id.; see United States v. Acosta-Vargas, 13 C.M.A. 388, 393, 32 C.M.R. 388, 393 (1962).

Depending on the circumstances, the military judge will instruct the members that:

> [t]he accused, under the pressure of a fast
> moving situation or immediate attack, is not
> required to pause at (his)(her) peril to

> evaluate the degree of danger or the amount
> of force necessary to protect
> (himself)(herself).  In deciding the issue
> of self-defense, you must give careful
> consideration to the violence and rapidity,
> if any, involved in the incident.

Military Judges' Benchbook para. 5-2-6.

5.    Opportunity to retreat or seek help

Depending on the circumstances, the military judge may be required to instruct the members to take into account whether the accused had an opportunity to withdraw safely or obtain the help of others.  See id.  The responsibility for deciding whether such factors, in light of the other circumstances, impact the issue of self-defense rests with the court-martial panel.  See id.

6.    The effect on self-defense when the accused acts as an aggressor, engages in mutual combat, or provokes an attack

Depending on the circumstances, an accused may lose the right to self-defense "if the accused was an aggressor, engaged in mutual combat, or provoked the attack."  R.C.M. 916(e)(4). The military judge must provide appropriate tailored instructions to the court-martial panel if the evidence indicates that the accused may have engaged in such conduct. Lewis, 65 M.J. at 87-89; R.C.M. 920(e)(3).  Under the model instructions set forth in the Benchbook, if the evidence raises the issue of loss of self-defense by provocation, the military judge informs the panel that the right of self-defense is not

6

lost unless the provoking act "is clearly calculated and intended by the accused to lead to a fight (or deadly conflict)". Military Judges' Benchbook para. 5-2-6.

7.   Regaining the right of self-defense

If there is evidence that the adversary of the accused "escalated the level of conflict" and placed the accused "in reasonable apprehension of immediate death or grievous bodily harm," the accused regains the right of self-defense. Id.; see Lewis, 65 M.J. at 88 (citing United States v. Cardwell, 15 M.J. 124, 126 (C.M.A. 1983)). Under the model instructions, if the accused engages in a provoking act or mutual combat involving "force not likely to produce death or grievous bodily harm" and the adversary escalates the conflict so that the accused is placed "in reasonable apprehension of immediate death or grievous bodily harm," the accused regains the right of self-defense. Military Judges' Benchbook para. 5-2-6. As our Court noted in United States v. Moore, 15 C.M.A. 187, 198, 35 C.M.R. 159, 170 (1964):

> One whose acts provoke a situation wherein he has to defend himself, who does so without intending thereby to provoke a difficulty, or who does so without intent to use the provoked assault as a pretext for killing or injury, does not thereby forfeit his right of perfect self-defense.

Because the underlying concept of self-defense involves protection and not aggression, the military judge is not

7

required to give an escalation instruction when the accused uses deadly force in the midst of a mutual affray to subdue an adversary. See Stanley, 71 M.J. at 64 (concluding that the military judge was not obligated to give such an instruction sua sponte when four disaffected drug traffickers armed with loaded weapons engaged in mutual combat in a chaotic fast-moving situation, and the defense did not present a theory of escalation at trial or request an escalation instruction; and observing that the accused's use of a loaded firearm to subdue an adversary in that situation constituted the use of deadly force under the particular circumstances of the case). A display of a loaded weapon, however, does not per se constitute use of deadly force. See id. at 63 n.3.

8.   The burden of proof

Where there is some evidence raising the right of self-defense and the related issues involving the opportunity to retreat and the loss of the right of self-defense, the prosecution bears the burden of proving that the accused did not have the right of self-defense. Military Judges' Benchbook para. 5-2-6. The responsibility of making the determination that the accused had an opportunity to retreat, that the accused lost the right of self-defense, or that the accused did not regain the right of self-defense, rests with the court-martial panel. See id.

B. DISCUSSION

1.  Prelude to the shooting

The parties generally agree on the predicate events. During Appellant's military assignment to the theater of operations in Iraq, his unit engaged in combat activities against hostile forces and suffered losses as the result of terrorist activities in the battlefield environment. Appellant sought to pinpoint responsibility for the attack. Through intelligence channels, he received information pointing to Ali Mansur as a person who could provide information about the attack. The initial interrogation, and a subsequent interrogation by other officials, did not produce useful information about the attack. During the initial interrogation, on May 5, 2008, Appellant used his helmet to strike Ali Mansur on the back, an act that resulted in his conviction for assault. The validity of that conviction is not at issue in the present appeal.

On May 16, 2008, after receiving orders to return Ali Mansur to his village, Appellant, who was accompanied by a noncommissioned officer (NCO) and an interpreter, decided on his own initiative to undertake a further interrogation of Ali Mansur en route in an isolated culvert. He did so even though it involved a deviation from the order he had received to return Ali Mansur to his village. Appellant did not have training or

responsibilities as an interrogator.  The interrogation techniques Appellant used included removing Ali Mansur's clothing, ordering him to sit, pointing a loaded weapon at Ali Mansur, and threatening to kill him if he did not provide the requested information.  Appellant acknowledged that in doing so, he used unauthorized interrogation methods.

2.   The two narratives

At trial, two different versions emerged as to what next occurred on May 16, 2008.  The prosecution, relying primarily on the testimony of the interpreter, the NCO, and forensic evidence, sought to convince the court-martial panel that Appellant took Ali Mansur to the culvert in order to kill him, and that he did so.  Neither the interpreter nor the NCO had a complete view of the events that immediately preceded the shooting, and the prosecution relied on other evidence, primarily the testimony of the pathologist who performed the autopsy, in an effort to convince the members that Appellant had engaged in an execution-style shooting of a defenseless person.

Appellant, in his testimony, acknowledged that he was not a trained interrogator, that he employed unauthorized interrogation techniques, and that he should not have done so. He stated that he used these techniques in an effort to extract information from Ali Mansur, and that he had no intent to kill him.  Appellant testified that during the interrogation, he

heard the sound of concrete hitting concrete over his shoulder. Appellant further testified that he saw Ali Mansur stand up from the sitting position and reach for Appellant's weapon; and at that point, in self-defense, Appellant shot Ali Mansur.

3.  The limited focus on the unauthorized interrogation techniques

With respect to the unauthorized techniques in the culvert on May 16, 2008, the Government did not charge Appellant with criminal violation of a specific order or regulation, maltreatment of a detainee, simple assault, or assault with a dangerous weapon, see Articles 92, 93, 128, UCMJ, 10 U.S.C. §§ 892, 893, 928 (2006); nor did the Government ask the military judge to find that the interrogation techniques amounted to any of those offenses as a basis for addressing the issue of self-defense.

The Government did not ask the military judge to conclude that the interrogation techniques constituted the use of deadly force for purposes of precluding Appellant from asserting the right of self-defense; nor did the Government ask the military judge to instruct the members on whether there was an opportunity to retreat or seek help from others.  The military judge did not conclude, as a matter of law or fact, that Appellant's interrogation techniques constituted the use of deadly force or that Appellant's conduct otherwise precluded a

self-defense instruction.  Instead, the military judge recognized that self-defense was in issue.  In that regard, there was "some evidence" in the record, primarily from Appellant's testimony, that he used the interrogation techniques for purposes of extracting information, and not for purposes of using deadly force to kill Ali Mansur; that Ali Mansur rose from his sitting position and reached for Appellant's weapon; and that, in a fast-moving scenario, and fearing that Ali Mansur might try to turn the pistol against him, Appellant shot Ali Mansur in self-defense.  In that context, providing the members with a self-defense instruction was necessary to ensure that the decision as to what actually transpired in the culvert would be properly made by the court-martial panel.

4.   The instructions provided by the military judge

The issue before us is whether the military judge, in the course of providing instructions on self-defense, correctly advised the members on how to address the issue of whether, based on their assessment of the facts, Appellant lost the right of self-defense.  In that regard, the granted issue does not call upon us to decide whether Appellant is, in fact, guilty of the act of murder.  The granted issue requires us to determine whether the court-martial panel received instructions from the military judge on the issue of self-defense that properly informed the members as to the determinations they would need to

12

make during the panel's deliberations on the issue of guilt or innocence.

The military judge sought to address the issue of provocation through the following instruction:

> Now there exists evidence in this case that the accused may have been assaulting Ali Mansur immediately prior to the shooting by pointing a loaded weapon at him. A person who without provocation or other legal justification or excuse assaults another person is not entitled to self-defense unless the person being assaulted escalates the level of force beyond that which was originally used. The burden of proof on this issue is on the prosecution. If you are convinced beyond a reasonable doubt that the accused, without provocation or other legal justification or excuse, assaulted Ali Mansur then you have found that the accused gave up the right to self-defense. However, if you have a reasonable doubt that the accused assaulted Ali Mansur, was provoked by Ali Mansur, or had some other legal justification or excuse, and you are not convinced beyond a reasonable doubt that Ali Mansur did not escalate the level of force, then you must conclude that the accused had the right to self-defense, and then you must determine if the accused actually did act in self-defense.

The defense objected, arguing that Appellant's conduct did not constitute the offense of assault. The military judge overruled that objection.

As noted in the majority opinion, the last sentence of the instruction is problematic. It sets forth six different determinations for the members to make, employs two different tests for the members to apply, and includes a confusing double-negative. The instruction asked the members to make the

13

following six determinations, with little or no guidance as to the critical standards applicable to each:

1. Did Appellant assault Ali Mansur?
2. Was Appellant provoked by Ali Mansur?
3. Did Appellant have some legal justification or excuse?
4. Did Ali Mansur escalate the level of force?
5. Did Appellant have the right to self-defense?
6. Did Appellant act in self-defense?

The instruction contains two different tests -- no reasonable doubt and beyond a reasonable doubt -- without clear linkage to the separate determinations. The confusing double-negative asked the members to determine whether "you are not convinced beyond a reasonable doubt that [Ali Mansur] did not escalate the level of force."

The record reflects the difficulty the members faced in comprehending and applying the instruction at issue. Before the members closed to deliberate, one of the members asked how an assault with a weapon nullifies a self-defense argument. In response, the military judge read for a second time the entire instruction on self-defense, without specifically addressing the member's question. In addition, one of the members asked for a printed copy of all of the instructions, a request that the military judge denied.

The instruction failed to provide the panel with any guidance as to whether Appellant had the opportunity to withdraw or seek help; nor did it provide the panel with any guidance on

14

how to determine whether Appellant's unauthorized interrogation: (1) constituted an assault as a matter of law; and (2) whether such conduct, if an assault, also constituted the use of deadly force for purposes of depriving Appellant of the right of self-defense.

The ambiguous wording of the instruction created the potential for the members to interpret it as requiring the panel to conclude that self-defense would not apply unless the evidence demonstrated each of the following: (1) an absence of assault; and (2) an escalation by the victim. Such an interpretation -- fairly implied from the text of the instruction but an incorrect statement of the law -- created a fair risk of prejudice. The instruction, compromising the right of Appellant to have the issue of self-defense decided by a properly instructed court-martial panel, constituted prejudicial error. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2006).

The majority opinion holds that any error was not prejudicial because no reasonable court-martial panel could have concluded that Appellant acted in self-defense. __ M.J. at __ (23). Under the majority view, Appellant did not have the right to defend himself, notwithstanding evidence that a person suspected of supporting the enemy rose up and reached for Appellant's weapon during an interrogation. The majority takes the position that Appellant, by virtue of conducting an

unauthorized interrogation that used improper techniques, including pointing a pistol at the suspect and using threatening words, did not have the right to defend himself when his life was threatened. __ M.J. at __ (18-23).

I respectfully disagree with the majority's conclusion on the question of prejudice. The evidence at trial established an issue of self-defense for resolution by the court-martial panel, not this Court. The evidence at trial included testimony that: (1) the events occurred during an interrogation of a person suspected of aiding enemy forces; (2) the interrogation sought to obtain information for use in the combat theater of operations; (3) Appellant removed the suspect's clothing, pointed a pistol at the suspect, and used threatening language for the purpose of obtaining useful information; and (4) Appellant had no intent to use deadly force against the suspect. Given the contested nature of this evidence at trial, the responsibility for deciding what occurred, and whether Appellant acted in self-defense, rested with a properly instructed court-martial panel. See supra Part I.A.

Under the majority's approach, the panel should not have had the opportunity to consider factual issues raised by Appellant's testimony, including whether the interrogation techniques amounted to the use of force likely to produce death or grievous bodily harm, whether Appellant intended to use the

interrogation techniques as a pretext for killing Ali Mansur, or whether Appellant reasonably apprehended that Ali Mansur rose up and reached for Appellant's weapon for the purpose of killing Appellant. These issues, however, were matters for resolution by a court-martial panel, not this Court. See supra Part I.A.

If the Government accuses a member of the armed forces of conducting an improper and abusive interrogation, the UCMJ provides ample authority to hold that person accountable in a court-martial. See supra Part I.B.3. Such accountability, however, does not require the servicemember to sacrifice the right of self-defense; nor does it deprive the servicemember of the right to have the panel decide whether, as a matter of fact, the circumstances justified the use of force to save the servicemember's life from an attack by a person suspected of supporting the enemy.

## II. DISCLOSURE OF EXCULPATORY EVIDENCE

Issue II addresses the Government's obligation to provide timely disclosure of exculpatory information to the defense. The information at issue had a direct bearing on Appellant's view of the case -- that he acted in justifiable self-defense. The majority concludes that any failure by the Government to disclose exculpatory information to Appellant in a timely manner did not prejudice Appellant. The majority relies primarily on the views set forth in the majority's discussion of Issue I, in

which it concludes that any error with respect to the question of self-defense did not prejudice Appellant. In the majority's view, the question of self-defense had no decisional significance in the case, rendering harmless any error in the disclosure of exculpatory information. I respectfully disagree.

## A. TRIAL PROCEEDINGS

The prosecution retained at Government expense a highly respected authority in forensic evidence, Dr. Herbert MacDonell, as an expert consultant and possible expert witness. During trial, the Government rested its case without calling Dr. MacDonell to testify, but continued to rely on him as an expert consultant during the presentation of the defense case, including the testimony of Appellant and the forensic experts called by the defense.

On Wednesday, February 25, 2009, Dr. Paul Radelat and Mr. Tom Bevel testified as expert witnesses for the defense and offered their opinions on the forensic evidence. They opined that the evidence indicated that Ali Mansur had been shot while standing, with the first shot to the chest and the second shot to the head. That testimony had great significance for the defense, as it provided scientific support for the defense theory of the case. In particular, that testimony tended to refute the Government's theory that Appellant shot Ali Mansur while he was sitting, and it tended to support the defense

18

theory that Ali Mansur was in an upright position, moving towards Appellant's weapon, when Appellant shot him in self-defense.

Consistent with the standard practice for expert consultants and potential expert witnesses, Dr. MacDonell sat in the courtroom and listened to the testimony of the defense experts. See M.R.E. 703. After observing the testimony of the defense witnesses, Dr. MacDonell met with another Government consultant, Dr. Berg, and the three prosecutors to discuss strategy and possible rebuttal.

The military judge later found that during this meeting, Dr. MacDonell "theorized and demonstrated that an unlikely but possible scenario, that was not inconsistent with the forensic evidence and the only logical explanation consistent with the testimony of Dr. Radelat and Mr. Bevel" was that Ali Mansur was shot first in the chest and second in the head. The military judge also found that "[t]his theory was not inconsistent with the forensic evidence, but was inconsistent with all other evidence known to the Government counsel and Dr. MacDonell." At this point, Appellant had not yet taken the witness stand.

On Thursday, February 26, 2009, Appellant testified that as Ali Mansur stood up and reached for his pistol, Appellant shot him twice. Again, Dr. MacDonell was in the courtroom in his capacity as a Government expert. After hearing Appellant's

19

testimony, Dr. MacDonell told Dr. Berg, "That's exactly what I told you yesterday." Late Thursday afternoon, the prosecution released Dr. MacDonell, who had requested permission to depart. As he left the courtroom, Dr. MacDonell approached the lead civilian defense counsel and said, "I would have made a great witness for you," or words to that effect. When asked what he meant by that, Dr. MacDonell responded that he couldn't comment because he was hired by the Government.

On Friday morning, February 27, 2009, the defense counsel approached the trial counsel, told her about the encounter with Dr. MacDonell, and asked her to explain what Dr. MacDonell meant by his remark. The trial counsel said she did not know, and that she was unaware of any exculpatory information. Neither party took any further action at that point, and the case proceeded to the announcement of findings Friday evening.

In the evening, trial counsel received an e-mail sent by Dr. MacDonell earlier that afternoon, which included Dr. MacDonell's observation that he was "concerned that I did not testify and have a chance to inform the court of the only logical explanation for this shooting," namely that Ali Mansur was standing when shot. (Emphasis added.) The trial counsel immediately forwarded it to the defense counsel on Friday night. The military judge also received a copy that night after the findings were announced.

20

On Saturday morning, February 28, 2009, the defense moved for a mistrial based upon the Government's failure to disclose Dr. MacDonell's opinion in a timely manner. The military judge heard testimony on the motion from Dr. MacDonell and accepted an oral stipulation of fact as to the conversation between the defense counsel and the trial counsel. Neither side offered additional testimony, but both the defense counsel and the trial counsel proffered their recollection of the events. Ultimately, the military judge denied the motion for a mistrial. He found that "[t]here is only one reasonable interpretation of Dr. MacDonell's statement, in light of his area of expertise i.e., that he would have testified that in his opinion the forensic evidence in some way favorably supported the Defense theory of the case." He also concluded that Dr. MacDonell's statement to the defense that he would have made a good defense witness was sufficient notice that he possessed favorable information under both Brady v. Maryland, 373 U.S. 83 (1963), and R.C.M. 701.

The military judge, however, did not focus his inquiry on whether the trial counsel erred by not sooner exploring this issue with Dr. MacDonell. Instead, the military judge expressed concern as to whether the defense counsel were ineffective, as a matter of law, in not conducting their own exploration of Dr. MacDonnell's comment. The military judge concluded that, even

if the defense team was deficient, there was no prejudice given the strong evidence supporting the murder conviction.

## B.  DISCUSSION

An accused is entitled to "a meaningful opportunity to present a complete defense."  California v. Trombetta, 467 U.S. 479, 485 (1984).  To aid the defense counsel in doing so, the government must disclose evidence that is material and favorable to the defense.  Brady, 373 U.S. at 87; R.C.M. 701.  Before trial, the defense made a specific request for the disclosure of all exculpatory evidence.  In the present case, the Government bears the burden of proving, as a matter of law, that nondisclosure in response to a specific request is harmless beyond a reasonable doubt.  United States v. Webb, 66 M.J. 89, 92 (C.A.A.F. 2008).

In view of the prosecution's disclosure of Dr. MacDonell's e-mail after the return of findings, the issue before us involves the timing of the disclosure.  Specifically, whether the disclosure to the defense on Friday night, after the return of findings, constituted timely disclosure in view of the prosecution's awareness of Dr. MacDonell's views prior to the return of findings.

As noted by the United States Court of Appeals for the Second Circuit in Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001) (citations omitted):

> It is not feasible or desirable to specify the extent or timing of disclosure <u>Brady</u> and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made. Thus disclosure prior to trial is not mandated. Indeed, <u>Brady</u> requires disclosure of information that the prosecution acquires during the trial itself, or even afterward.
>
> . . . At the same time, however, the longer the prosecution withholds information, . . . the less opportunity there is for use.

The comments by Dr. MacDonell to the trial counsel on Wednesday afternoon placed trial counsel on notice that Dr. MacDonell held an opinion favorable to the defense that she had a duty to promptly disclose. Irrespective of the duty on Wednesday afternoon, when the defense counsel approached the trial counsel and questioned her about Dr. MacDonell's startling statement that he would have made a good defense witness, the trial counsel at that point had a duty to contact Dr. MacDonell, to inquire promptly into the meaning of that statement, and to disclose the information to the defense team as soon as possible.

In denying the motion for a mistrial, the military judge concluded that even if the defense had sought to put Dr. MacDonell on the stand to offer his opinions, he would have ruled that testimony inadmissible. The military judge set forth two reasons for that conclusion. First, Dr. MacDonell's opinion of the value of the forensic evidence never really changed.

Second, any "revised" opinion was not based on any reassessment of the evidence but merely reflected his evaluation of Appellant's credibility. The Court of Criminal Appeals held that the military judge would not have abused his discretion in precluding that testimony. United States v. Behenna, 70 M.J. 521, 530 (A. Ct. Crim. App. 2011). Even if the testimony had been admitted, the lower court concluded that the outcome of the trial would not have changed in view of the Government's overwhelming evidence of guilt. Id.

The issue of whether Dr. MacDonell's opinion was changed or revised has no bearing on the duty to disclose. The information was favorable to the defense. As noted by the military judge, the "only . . . reasonable interpretation of Dr. MacDonell's statement . . . favorably supported the Defense theory of the case." The fact that Dr. MacDonell came to that view after considering the facts, data, and testimony presented during the court-martial underscores the importance of timely disclosure. See R.C.M. 703; United States v. Houser, 36 M.J. 392, 399 (C.M.A. 1993).

The record demonstrates that Dr. MacDonell's potential testimony setting forth his expert views was not confined to a mere belief in the credibility of Appellant's testimony. He would have provided the court-martial panel with detailed, expert testimony, supplementing the information that had been

provided by the two defense experts, from the perspective of a Government-employed consultant of considerable reputation. See United States v. Mustafa, 22 M.J. 165, 166 (C.M.A. 1986) (describing Dr. MacDonell as the "preeminent practitioner in the field").

The Government's theory of the case, as articulated immediately prior to closing of the trial for deliberation on findings, underscores the prejudice to Appellant stemming from the failure to provide timely disclosure of Dr. MacDonell's opinion. The prosecution's closing argument sought to assure the members that the testimony from the defense experts had little worth because they simply set forth possibilities instead of a definite opinion based upon the forensic evidence. Had Dr. MacDonell been called to testify by the defense, it is reasonably foreseeable that he would have added further information from an important perspective, beyond the testimony of the defense experts, based upon his expertise in blood spatter analysis.

### III. CONCLUSION

A death occurred in the theater of operations. A soldier has been convicted of murder. Was it murder or self-defense? By law, the responsibility for making that factual determination rested with the court-martial panel, not with this Court. The ambiguous, confusing, and incorrect instructions from the

military judge deprived Appellant of the right to have a panel of officers make that decision. The military judge compounded that error by failing to take corrective action with respect to the Government's failure to provide timely disclosure of exculpatory evidence. This Court should reverse the decision of the Court of Criminal Appeals and authorize a rehearing.